# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | * |
| Plaintiff, | * |
| v. | *      Civil Action No. 8:17-cv-02861-PX |
| OPTIMAL SOLUTIONS & TECHNOLOGIES, INC., | * |
| Defendant. | * |
| | *** |

## **MEMORANDUM OPINION**

This disability discrimination case concerns the termination of Michael Tyson from his employment at Defendant Optimal Solutions & Technologies, Inc. (OST). Pending before the Court is Defendant's motion for summary judgment (ECF No. 41), Defendant's motion to seal certain exhibits (ECF No. 40), Plaintiff Equal Employment Opportunity Commission's (EEOC) motion to strike the declaration of Samia Sikander (ECF No. 43) and Plaintiff's cross-motion for summary judgment (ECF No. 42). The motions are fully briefed and no hearing is necessary. *See* Loc. R. 105.6. For the following reasons, the Court grants OST's motion to seal and denies the EEOC's motion to strike Samia Sikander as moot.[1] As for the summary judgment motions, the Court grants in part and denies in part the EEOC's partial motion and denies OST's motion.

---

[1] The Court grants the consent motion to seal those exhibits which include Tyson's sensitive medical information. *See Rock v. McHugh*, 819 F. Supp. 2d 456, 475–76 (D. Md. 2011) (sealing certain sensitive medical information, including plaintiff's medical condition and treatment). As to the EEOC's motion to strike Samia Sikander's declaration (ECF No. 43), although it appears Sikander had not been previously disclosed as a witness, even if the Court had considered her affidavit, it would not change the outcome of the pending cross-motions for summary judgment. Thus, the Court denies the motion to strike as moot. The EEOC is free to move *in limine* to preclude OST from calling Sikander as a witness at trial.

## I. Background

The following facts are undisputed. OST is a technology, engineering, and services contractor that serves governmental agencies and the private sector. ECF No. 41 at 8. OST is headquartered in McLean, Virginia, but has several other offices, including one in Hyattsville, Maryland. *Id.* At the Hyattsville location, OST serviced several contracts with the Federal Emergency Management Administration ("FEMA"). *Id.* at 9. An infrastructure group in the office helped service those contracts and included a help desk, systems engineers, SharePoint administrators, and other employees. *Id.*; ECF No. 42-3 at 4.

SharePoint is a database that allows insurance adjusters working for FEMA to review documents in claims files. ECF No. 42-5 at 6. SharePoint administrators at OST managed two SharePoint servers for FEMA and were responsible for backing up the SharePoint servers and providing users access to sites within SharePoint. ECF No. 4-24 at 14. Mike Adibpour managed this infrastructure group, which fell under a larger business unit managed by Robert Wilkison. ECF No. 41-25 at 5–6; ECF No. 42-3 at 4. Adibpour directly supervised William Wang, a senior SharePoint administrator, Eric Zarnosky, a systems engineer, Samia Sikander, who worked the help desk, and Tyson. ECF No. 42-3 at 4–5; ECF No. 42-5 at 5; ECF No. 41-18 at 2–3.

Tyson applied to OST on June 3, 2016, having spent years working in the IT field and with SharePoint. ECF No. 41-4 at 7; ECF No. 42-2 at 17–21. Days later, OST hired Tyson for the position of senior SharePoint Administrator. ECF No. 41-6 at 2; ECF No. 42-2 at 6. Adibpour was Tyson's direct supervisor. ECF No. 42-3 at 4.

Tyson, like all new OST employees, was subject to a six month probationary period. ECF No. 41-5 at 16. The probationary period is designed to "see if the employee is a good fit with the company…[and] the role" and whether he is "able to perform the job duties." ECF No.

41-26 at 16–7. Once an employee completes the probationary period, he is subject to a written progressive discipline policy to address employment related shortcomings. The policy provides for graduated responses to employment related issues, to include a verbal and written warning prior to termination. ECF No. 42-6 at 18; ECF No. 41-5 at 35–37.

Tyson came to his new position at OST having struggled for six years with eye problems that included double vision, an inability to adduct his right eye (inability to turn his right eye outward), ptosis (drooping eyelid), and exophthalmos (protruding eye). ECF No. 42-4 at 3–5, 9. Just before Tyson started his new job, he had been diagnosed with a meningioma or a benign tumor located in the membranes that surround the brain and spinal cord. *Id.* at 9, 13, 15. Tyson's treating neurosurgeon, Dr. Howard Eisenberg, arrived at this diagnosis after reviewing the results of Tyson's MR scan and concluded that the tumor, which pressed on Tyson's optic nerve, most likely was causing the above-described symptoms. *Id.* at 6–7, 15; *see also* ECF No. 40-3. Dr. Eisenberg noted that the problem was "progressive" and referred Tyson to Dr. Robert Malyapa to begin proton beam radiation therapy, a novel and advanced treatment designed to shrink certain tumors. ECF No. 42-4 at 16. Treatment was set to begin around October 2016. ECF No. 42-2 at 14–15.

Shortly after Tyson began at OST, he shared with Adibpour that he had a brain tumor. ECF No. 41-13 at 2; ECF No. 41-15 at 5. According to Tyson, the two men discussed their respective health conditions. ECF No. 41-23 at 35–36. Tyson also told Adibpour that he would receive treatment on his own time so he would not need to miss work, and that the targeted radiation would not have any side effects. *Id.*; ECF No. 41-15 at 5. Although Adibpour denies that this conversation ever took place, ECF No. 41-24 at 27–28, Tyson's coworker, Eric Zarnosky testified that he learned about Tyson's brain tumor from Adibpour and that on many

3

occasions Adibpour expressed to Zarnosky concern about whether Tyson could do his job in light of his health condition. ECF No. 42-5 at 18, 20, 22; *see also* ECF No. 42-7 ¶¶ 16, 18 (OST coworker Timothy Connor's sworn declaration as to having learned of Tyson's brain tumor from Adibpour and of his concern that Tyson would not be able to perform his job adequately).

During the time Tyson worked at OST, he and Wang were at odds. ECF No. 41-18 ¶ 11; ECF No. 41-24 at 20–21. Although Wang had worked at OST far longer than Tyson, Wang had become widely known for his abrasive and combative demeanor. *See* ECF No. 42-5 at 13–14 (Zarnosky describing incident in which Adibpour stated Wang needed to be fired); *id.* at 15 ("[e]verybody in that office had an issue with [Wang] at some point. [Wang] had some type of confrontation with almost every person he interacted with);[2] *id.* at 31; ECF No. 41-27 at 4 (OST employee Stephanie Ankrah describing that Wang behaved disrespectfully and yelled at her, which she reported to Adibpour); *id.* at 9 (Ankrah describing Wang having lunged at another female employee); ECF No. 42-7 ¶ 9 (Connor describing Wang as "often combative and challenged people over obscure technical matters"). Others, including Zarnosky, also expressed concern that Wang could not perform the necessary job requirements. ECF No. 42-5 at 14, 16–17; ECF No. 42-7 ¶ 8. Adibpour, prior to learning of Tyson's brain tumor, had even discussed with Zarnosky his intent to fire Wang once Tyson familiarized himself with the FEMA SharePoint system. ECF No. 42-5 at 13, 15, 18, 31; ECF No. 41-22 at 4.

On September 14, 2016, Tyson, Wang and Zarnosky engaged in a heated email exchange, culminating with Tyson emailing his two coworkers to "stop this nonsense and just LOG ON TO THE SERVER!!". ECF No. 42-6 at 26–29. This exchange took place on the FEMA email system, and thus was accessible to OST's client. *Id.*

---

[2] After Tyson's termination, Wang received two additional warnings for his unprofessional behavior exhibited with OST clients. ECF No. 41-21 at 17–19.

On September 27, 2016, Adibpour issued Wang and Zarnosky verbal warnings for the email exchange. ECF No. 47-9 at 2–3. Tyson, in contrast, was terminated. ECF No. 41-13. ECF No. 41-21 at 8–10. Mary Homer, OST's head of Human Capital Management, explained that Wang received only a warning because he was no longer a probationary employee, whereas Tyson, with only three months at OST, was fired because he was still on probation. ECF No. 41-21 at 8, 14. However, Homer also acknowledged that all OST personnel are at-will employees, subject to termination at any time. *Id.* at 19–20.

Tyson filed a formal charge of disability discrimination with the EEOC, and the agency elected to pursue the claim against OST. ECF No. 41-13. In the Complaint filed before this Court, the EEOC alleges that OST discriminated against Tyson when it fired him on account of an actual and perceived disability, in violation of Section 102(a) of Title I of the ADA, 42 U.S.C. § 12112(a). ECF No. 1 ¶ 22.

**II. Standard of Review**

Summary judgment is appropriate when the Court, viewing the evidence in the light most favorable to the non-moving party, finds no genuine disputed issue of material fact, entitling the movant to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). Importantly, "a court should not grant summary judgment 'unless the entire record shows a right

to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'" *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co.*, 381 F.2d 245, 249 (4th Cir. 1967)). Where the party bearing the burden of proving a claim or defense "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is likewise warranted. *Celotex*, 477 U.S. at 322.

"Where, as here, cross motions for summary judgment are filed, a court must 'evaluate each party's motion on its own merits, taking care [in each instance] to draw all reasonable inferences against the party whose motion is under consideration.'" *Snyder ex rel. Snyder v. Montgomery Cty. Pub. Sch.*, No. DKC 2008-1757, 2009 WL 3246579, at *5 (D. Md. Sept. 29, 2009) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

**III. Analysis**

The parties cross move for summary judgment on whether Tyson is protected under the ADA. The parties also vigorously dispute whether OST fired Tyson because of his brain tumor or because of poor job performance. The Court first discusses the pertinent statutory and regulatory framework, and then turns to the parties' cross motions.

**A. The ADA and ADAAA**

The ADA forbids employers from intentionally discriminating against persons with disabilities. 42 U.S.C. § 12112(a)-(b). *See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 59 (4th Cir. 1995), *as amended* (June 9, 1995), *as amended* (Mar. 14, 2008). Discrimination claims brought pursuant to the ADA are subject to the *McDonnell Douglas*

burden-shifting framework. *Id.* at 58. Under this framework, a plaintiff must first establish a prima facie case of disability discrimination with evidence demonstrating that he was (1) a qualified individual with a disability; (2) who had been discharged; (3) while fulfilling his employer's legitimate expectations at the time of discharge; and (4) the circumstances of his discharge raise a reasonable inference of unlawful discrimination. *Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012); *see also Ennis*, 53 F.3d at 58 (citing *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253); *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001). If the plaintiff makes a prima facie case, the burden then shifts to the defendant to produce evidence that the defendant acted with a legitimate, nondiscriminatory reason. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 575 (4th Cir. 2015). If the defendant meets its burden of production, the burden shifts back to the plaintiff to show that the proffered legitimate reason was mere pretext. *Id.*

The ADA expressly states that "[t]he term 'disability' means, with respect to an individual—

    (A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual;

    (B) a record of such an impairment; or

    (C) being regarded as having such an impairment."

42 U.S.C. § 12102(1).

In 2008, Congress passed the ADA Amendments Act of 2008 (ADAAA) with the purpose of "reinstating a broad scope of protection . . . under the ADA." Pub. L. No. 110–325 § 2(b)(1), 122 Stat. 3553–3554 (2008). In line with this enhanced scope, the ADAAA broadened the definition of "major life activities" to include, but not be limited to, "caring for oneself,

performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working" as well as the "operation of a major bodily function, including but not limited to, functions of the immune system, *normal cell growth,* digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* (emphasis added). Importantly, the statute expressly directs that the definition of disability "shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A).

### B. Tyson's Status as an Individual with a Disability

The EEOC argues that Tyson enjoys ADA protection because his brain tumor substantially limits normal cell growth. ECF No. 42 at 14–18. Alternatively, the EEOC maintains that Tyson is covered because his employer perceived him to have a disability on account of his brain tumor. *Id.* at 18–19. OST maintains the contrary. ECF No. 41 at 19–25. The Court addresses each basis separately.

#### 1. Whether Tyson's Meningioma Constitutes a Disability

The undisputed record, according to Tyson's treating neurosurgeon, Dr. Eisenberg, shows that Tyson's symptoms are the result of a meningioma, or a "tumor of the coverings of the brain . . . or in the intracranial space." ECF No. 42-4 at 3. Dr. Eisenberg explains that this tumor, although benign, is caused by abnormal division of cells in that the cell division is "unregulated or poorly regulated." *Id.* at 6. Dr. Eisenberg opines, unrebutted, that as the meningioma has grown due to the abnormal division of cells, it has led to Tyson's double vision and the other structural changes to his eye. *Id.* at 7. Specifically, the tumor has pressed against Tyson's right optic nerve. *Id.* at 13, 15.

8

Based on this evidence, the Court cannot discern any reasonable dispute of material fact as to whether Tyson qualifies as disabled. The ADA makes plain that a condition which substantially affects normal cell growth constitutes an impairment of a major life activity. *See Norton v. Assisted Living Concepts Inc.*, 786 F. Supp. 2d 1173, 1185 (E.D. Tex. 2011) ("The Act now clarifies that as long as an impairment substantially limits one major life activity, such as normal cell growth, it need not limit other major life activities, such as working, in order to be considered a disability."). Tyson's abnormal cell growth is serious enough to have produced a meningioma inflicting obvious and transparent physical limitations such as double vision, limitations on eye movement, and other outward manifestations of the tumor. Because Tyson's meningioma arose from cell division so abnormal and unregulated that it impacted surrounding cells and nerves, and led to obvious physical symptoms, it constitutes a substantial limitation of the major life activity of normal cell growth.

Although few courts have been called to decide whether benign tumors rise to the level of a disability, one provides special guidance here. In *Coker v. Enhanced Senior Living, Inc.*, the court determined that the plaintiff's non-cancerous breast disease constituted a disability because it substantially limited normal cell growth. 897 F. Supp. 2d 1366, 1372, 1376 (N.D. Ga. 2012). Similar to this case, the court was called to decide whether noncancerous masses in plaintiff's breasts that were "the result of abnormal cell growth" qualified as a disability. *Id*. at 1369, 1376. Although the record did not reflect plaintiff as suffering from any particular symptoms, the court concluded as a matter of law that the plaintiff's "major life activity" of "normal cell growth," along with endocrine and reproductive functioning, had been substantially impaired, and so plaintiff was disabled under the ADA. *Id.* at 1375–76. The court emphasized that its decision

comports with the ADAAA's own directive that "the term 'disability' 'be construed in favor of broad coverage.'" *Id.* at 1375 (quoting 42 U.S.C. § 12102(4)(A).

Similarly, the unrebutted medical evidence demonstrates that Tyson's meningioma is the product of "abnormal" or "unregulated" cell division. ECF No. 42-4 at 6. Further, on this record, Tyson's tumor is serious enough to have caused objectively identifiable vision and ocular impediments. *Id.* at 6–7. It is beyond dispute, therefore, that Tyson suffers from a substantial limitation on his normal cell growth.

OST mounts several challenges to this determination, none of which are availing. First, OST contends that Tyson's own belief that he is not disabled should end the analysis. ECF No. 41 at 27. OST misconstrues the record, because it is Tyson's own self-described symptoms of double vision and inability to move his eye properly that led him to obtain medical treatment in the first instance. ECF No. 42-4 at 3, 9, 15. Thus, Tyson corroborates, rather than undermines, that his cell growth was sufficiently limited such that his body produced a meningioma of size and placement that has caused his ocular symptoms. That Tyson displays a chin-up attitude as exemplified by his scheduling treatment after work hours or continuing to teach an exercise class, does not generate a genuine issue of disputed fact as to whether Tyson is disabled under the ADA.

OST next contends the Court should treat the ADA's regulations referencing cancer as some limiting principle to deny Tyson protected status. ECF No. 47 at 4. To hold otherwise, says OST, would mean *any* abnormal cell growth, no matter how minor, would trigger ADA protection. *Id.* The Court does not agree with OST's floodgates contention.

29 C.F.R. § 1630.2(j)(3)(iii) points to cancer as one example of abnormal cell growth which *at a minimum* will constitute a disability. It states:

> *For example,* applying the principles set forth in paragraphs (j)(1)(i) through (ix) of this section, *it should easily be concluded* that the following types of impairments *will, at a minimum*, substantially limit the major life activities indicated . . . cancer substantially limits normal cell growth.

*Id.* (emphasis added).

The regulation, therefore, does not confine substantial limitation on normal cell growth only to cancer. To read the regulation as restrictively as OST suggests would not only contravene the regulation's plain language but would also be at odds with the ADAAA's directive to construe the definition of disability "in favor of broad coverage." 42 U.S.C.A. § 12102.

More to the point, Tyson's cell growth is hardly commonplace; it is so abnormal that it caused Tyson significant eye problems. In this regard, granting summary judgment in this case simply does not risk that *every* kind of abnormal cell division, no matter how small, will trigger coverage under the ADA.

Lastly, OST contends that Dr. Eisenberg's own testimony underscores the difficulties in concluding as a matter of law that Tyson's meningioma qualifies as a disability under the ADA. Specifically, OST notes that Dr. Eisenberg essentially retracted the portion of his sworn declaration stating that "meningioma substantially limits the major bodily function of normal cell growth because it is an abnormal growth of the cells of the meninges." ECF No. 41-19. At deposition, Dr. Eisenberg candidly admitted that he did not remember "what he meant by [that] sentence" and that "reading it now, [the sentence] doesn't make sense to me." ECF No. 41-20 at 13–14. Read most favorably to OST, the Court must disregard this statement in Dr. Eisenberg's declaration. But this was not the only evidence on which the EEOC relies. Rather, Dr. Eisenberg quite clearly testified that Tyson's meningioma, which compromised Tyson's vision and functioning in his right eye, was the result of "abnormal" or "unregulated or poorly

regulated" cell division. ECF No. 42-4 at 6–7. OST offers no medical evidence to the contrary. Accordingly, no reasonable factfinder could disagree that Tyson's cell growth was substantially limited, and thus constitutes a disability under the ADA.

### 2. "Regarded" as having a disability

The EEOC additionally argues summary judgment is proper in Tyson's favor as to whether he was "regarded as having a disability." ECF No. 42 at 18–19. An individual is regarded as being disabled if he is perceived, albeit erroneously, as having an impairment that substantially limits one or more of his major life activities. 42 U.S.C.A. § 12102(3). Put simply, even if an individual is not in fact disabled, if his employer believes otherwise, then the individual is protected against discrimination on account of the employer's mistaken belief. *Young v. United Parcel Serv., Inc.*, 784 F.3d 192, 199 (4th Cir. 2015); *Coursey v. Univ. of Maryland E. Shore*, No. CCB-11-1957, 2013 WL 1833019, at *4 (D. Md. Apr. 30, 2013), *aff'd*, 577 F. App'x 167 (4th Cir. 2014). However, an employer's awareness of an employee's impairment, without more, is insufficient to demonstrate that the employee was regarded as disabled. *Haulbrook*, 252 F.3d at 703.

Because the Court has already found as a matter of law that Tyson is disabled, it need not strictly reach this question. However, as discussed below, the Court denies summary judgment on whether Tyson was terminated on account of his disability. This matter, therefore, will proceed to trial. Thus, to the extent that Tyson wishes to litigate whether he is alternatively covered under the ADA as a person regarded as disabled, the Court will reach this question here.

The Court denies summary judgment because a genuine dispute of fact exists as to whether Adibpour knew of Tyson's condition before Tyson's termination. *Compare* ECF Nos. 41-27 at 5; 42-5 at 18; 42-7 at 3; 42-2 at 9–10 (Ankrah, Zarnosky, Connor, and Tyson testifying

that Adibpour knew of the tumor prior to termination) *with* ECF Nos. 41-24 at 24–26; 41-26 at 22–23 (Adibpour and Human Resources employee Sarah Tran testifying that they did not know about the medical condition). Although Adibpour denies any such knowledge, the record demonstrates otherwise. Zarnosky recounted in detail how Adibpour disclosed to him that Tyson had a brain tumor. ECF No. 42-5 at 18, 22. Tyson similarly testified that before he was fired, Zarnosky told Tyson that he learned of Tyson's tumor from Adibpour. ECF No. 42-2 at 11.

What is more, Zarnosky vividly recalls Adibpour questioning whether Tyson could do his job because of the tumor. ECF No. 42-5 at 18, 20, 22. In the same conversation when the two men discussed Tyson's tumor, Adibpour told Zarnosky he wondered whether his original plan to replace Wang with Tyson could now come to fruition. *Id.* at 18. This conversation provides powerful evidence from which a factfinder could conclude that Adibpour regarded Tyson as disabled and fired Tyson as a result. It will be left to the trier of fact to determine whether to believe Adibpour on the one hand or Zarnosky and Tyson on the other.

### C. Terminated on Account of a Disability

Defendant lastly urges that the Court grant summary judgment in its favor because no evidence exists that the decisionmakers who fired Tyson knew about his tumor at the time. ECF No. 41 at 27. As to the third element of the prima facie case, causation, Tyson must prove that his disability (or OST's regarding him as disabled) was the "but-for" cause of his firing. *Gentry v. E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 235 (4th Cir. 2016). Viewing the record most favorably to Tyson, summary judgment as to causation must be denied.

The record evidence viewed most favorably to the Plaintiff demonstrates that Adibpour played a significant role in firing Tyson. ECF No. 41-24 at 4 (Adibpour acknowledging his role in deciding whether to fire Tyson); ECF No. 41-25 at 10 (Wilkison noting that his actions were

13

based on Adibpour's recommendation as he himself did not work with Tyson); ECF No. 41-21 at 8. Further, Adibpour knew about Tyson's tumor, *see* ECF No. 42-2 at 9–10; ECF No. 41-27 at 5; ECF No. 42-5 at 18; ECF No. 42-7 at 3, and expressed concern that Tyson would not be able to get his job done as a result. ECF No. 42-7 at 3; ECF No. 42-5 at 18, 20–21. Tyson was also fired within the month after Adibpour found out about the tumor and just weeks before the start of Tyson's treatment. ECF No. 47-13; ECF No. 42-4 at 15; ECF No. 42-5 at 29–30; ECF No. 41-15 at 4. Such close temporal proximity weighs in favor of finding a genuine dispute as to causation. *See Haulbrook*, 252 F.3d 696, 706 (4th Cir. 2001) (finding that temporal proximity can create a genuine dispute to causation); *Jacobs*, 780 F.3d at 575 (same). OST's motion is denied on these grounds.

**D. Pretext**

Similarly, OST's motion for summary judgment must be denied as to whether its legitimate, nondiscriminatory reasons for terminating Tyson were pretextual. Where an employer has generated some evidence of a legitimate, non-discriminatory reason for terminating an employee, the employee then must show that such justifications, even if true, amount to post hoc rationalizations invented for purposes of litigation. *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 647 (4th Cir. 2002). "Contradictions between an employer's proffered explanation and the contemporaneous statements of the employer are convincing evidence of pretext." *E.E.O.C. v. Town & Country Toyota, Inc.*, 7 F.App'x 226, 233 (4th Cir. 2001)

Although OST has generated evidence that Tyson was viewed by some as lacking necessary technical skills, ECF No. 41-24 at 3; ECF No. 41-21 at 7–9, and that he behaved poorly as to the September 14, 2016 email exchange, ECF No. 41-21 at 10, a reasonable factfinder could also conclude the contrary. Zarnosky, for example, testified clearly that Tyson

14

could do the job well. ECF No. 41-22 at 13 (Zarnoksy sharing that Tyson "was responsive to users," "would actually go to the user's desk," and "would educate the user"). *See also* ECF No. 42-7 at 2 (Connor declaring that Tyson was pleasant, professional, and easy to worth with); ECF No. 41-27 at 3 (Ankrah noting that Tyson was "easy to work with"); ECF No. 42-2 at 7–8 (Tyson testifying that Adibpour gave him only positive feedback on performance). Moreover, no contemporaneous documentation supports that Tyson could not handle the technical aspects of his position. *Cf. Country Toyota*, 7 F.App'x at 233 (reversing grant of summary judgment in favor of defendant where there was "no evidence contemporary with [plaintiff's] employment to show that he really did lack adequate sales skills and required excessive amounts of assistance from sales managers" and noting that "the short duration of [plaintiff's] employment does not explain why he was never given verbal warnings or told upon his termination that his performance was substandard."). Finally, Tyson's prior experience in IT and Sharepoint undermines OST's contention that he struggled in his new role. *See* ECF No. 42-2 at 17–21.

As for the September 14 email, a factfinder is free to reject OST's contention that Tyson was fired simply because he was on probation at the time. All OST personnel were at-will employees. ECF No. 41-21 at 19–20. Thus, OST could terminate any employee for cause, including Wang and Zarnosky. *Id.* Accordingly, a reasonable factfinder could conclude that OST's failure to act consistently among employees undermines OST's proffered reasons for terminating Tyson. *See King v. Rumsfeld,* 328 F.3d 145, 151–52 (4th Cir. 2003) (finding that a plaintiff may demonstrate pretext by showing that other similarly situated individuals have committed the same violations but have not suffered the same consequences). Tyson has also generated sufficient evidence that Wang, who held the same position as Tyson (ECF No. 42-3 at 5–6; ECF No. 41-26 at 14), had a history of bad behavior that would have put him in serious

15

jeopardy of termination even under the progressive discipline policy. *See, e.g.,* ECF No. 42-15 at 12; ECF No. 42-3 at 7–9; ECF No. 42-6 at 20–22. When viewing the evidence most favorably to Tyson, a finder of fact could conclude that OST's proffered reasons were indeed pretextual.

Summary judgment in favor of OST must be denied.

### E. Punitive Damages

Punitive damages are recoverable if a plaintiff can demonstrate that his employer "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999).

OST argues that its ADA Policy in its Employee Handbook, coupled with Homer's attestation that OST has consistently adhered to its ADA policy, provides uncontroverted evidence that OST did not exhibit malice or reckless indifference in its noncompliance. ECF No. 41 at 31–32. To defeat a punitive damages award, OST bears the burden of demonstrating that it engaged in good-faith efforts to comply with the law. *Golson v. Green Tree Fin. Servicing Corp.*, 26 F. App'x 209, 214 (4th Cir. 2002) (citations omitted). Although an employer's ADA policy can be evidence of good faith, *id.*, its "mere existence . . . will not alone insulate an employer from punitive damages liability." *E.E.O.C. v. Fed. Express Corp.*, 513 F.3d 360, 374 (4th Cir. 2008).

When viewing the record most favorably to the EEOC, the propriety of punitive damages must reach the jury. To start, OST's Policy does not include a complete definition of disability and so does not properly advise employees as to the scope of ADA coverage. ECF No. 41-5 at

16

9–10. Moreover, OST also gives employees a form on which they may self-classify as not disabled. Yet the form also does not properly define "disability," nor does it cite to the relevant, controlling statute. ECF No. 41-7. Indeed, a reasonable factfinder may conclude that the form, fairly read, misleads OST employees about the scope of ADA coverage, and thus hinders the exercise of their rights under the prevailing law. Finally, the record reflects that OST did not provide any training to its employees on the ADA generally or its Policy more specifically, raising the inference that OST had no real interest in educating its employees as to the protections afforded under the statute. *See Golson*, 26 F. App'x at 214 (affirming award of punitive damages where there was no evidence that defendant provided follow up training).[3] Thus, sufficient evidence exists in the record from which a reasonable factfinder could award punitive damages. OST's motion for summary judgment is denied.

## IV. Conclusion

For the above stated reasons, the EEOC's partial motion for summary judgment (ECF No. 42) is granted in part and denied in part. OST's motion for summary judgment (ECF No. 41) is denied. A separate order follows.

11/19/19  
Date

/S/  
Paula Xinis  
United States District Judge

---

[3] To be sure, a reasonable factfinder could conclude that OST's misleading handbook and election form contributed to Tyson misclassifying himself to OST as "not disabled."